MORAN v. STATE OF OHIO.

**1. STATEMENT MADE BY ACCUSED.**

It is not error to allow evidence to be introduced concerning a statement or expression alleged to have been made by the accused when charged with the commission of the crime, at a time when several persons were present, but testified to by only one, while the others did not hear it. Such testimony is clearly competent, the weight is to be considered by the jury.

**2. ORDER OF TESTIMONY.**

The order in which testimony goes to the jury does not affect its competency, if it all finally gets to the jury.

**3. EVIDENCE REGARDING SUBJECT MATTER WHICH IS CLEARLY INCOMPETENT.**

It is not error to allow a preliminary question which is itself competent to be asked and answered, when the court and prosecuting attorney both knew that the subject matter to which such question related was clearly incompetent.

**4. EVIDENCE OF THE DESCRIPTION OF THE ACCUSED.**

Where the counsel for accused on cross-examination of the officer making the arrest, attempts to show that he acted recklessly and without any reliable information, it is competent on re-examination to let him state that before starting out to make the arrest that the wife of the deceased gave him a description of the man who made the assault, and also to state what the description was. This evidence being competent on the ground that it is an explanation of the evidence given in the cross-examination.

**5. EFFECT OF ALLOWING INCOMPETENT EVIDENCE TO BE INTRODUCED.**

Before a judgment will be reversed for allowing incompetent evidence to be introduced, such evidence must be both erroneous and prejudicial to the accused.

**6. INSTRUCTION OF GOOD CHARACTER.**

It is not error for the court to refuse in giving certain instructions of good character regarding the accused, in which the court is asked to determine the weight of the testimony offered, instead of a request to state to the jury the effect and purposes of the testimony referred to and the proper use to be made of it by the jury.

**7. VERDICT CONTRARY TO EVIDENCE.**

A judgment will not be reversed because the verdict is contrary to the evidence, unless it is manifestly so, and the reviewing court will always hesitate to do so when the doubts of its propriety arises out of a conflict in oral testimony.

HALE, J. (orally).

The plaintiff in error, Patrick Moran, was tried at the April term of this court of common pleas of this county, upon an indictment containing three counts, charging him with murder in the first degree in causing the death of James Fox. The alleged date of the crime was December 25, 1892. He was convicted of murder in the second degree on the first count of the indictment, and acquitted of all other charges. A motion for a new trial was overruled by the court, and a life sentence imposed.

A bill of exceptions was taken and the record brought here for review.

The errors insisted on may be classified under three heads:

Moran v. State of Ohio.

1. Decision of the court upon objections made to the admission of testimony.

2. Errors in the charge of the court to the jury.

3. That the verdict is contrary to the evidence.

*First*—Did the court err in any of the rulings on the admission or exclusion of testimony?

(1.) On the night of the homicide and about one hour after the assault, Moran was arrested by two police officers without a warrant, and taken to the house of Theodore Blakeslee, 73 Church street, where the crime was committed. Blakeslee was assaulted and mortally wounded at the same time the assault was made upon Fox, and undoubtedly by the same person.

At the time Moran was brought to his house, Blakeslee was lying on the floor in a dying condition, and did, in fact, expire a short time thereafter.

Mrs. Blakeslee claimed to have seen the murderer as he left the house after the assault, and was brought into the room for the purpose of determining whether Moran was the man she had seen. Several witnesses were permitted to testify to what occurred while Moran was there and in his presence, including statements made by Mrs. Blakeslee to or about Moran. The introduction of this testimony was resisted on the ground that Moran was at the time under arrest, and not called upon to make answer to charges made against him, and should not be prejudiced by the fact that he remained silent.

When brought into the room Mrs. Blakeslee said, in substance, "you are the man that killed my husband; you did it," or "there is the man that killed my husband; he did it." It will be conceded that if Moran had made any answer to the charge thus made to him or in his hearing, both the statements made to him and his reply would be competent.

It appears from the record that testimony was given tending to establish the fact that Moran did not keep silent, but did speak.

One witness says he heard Moran say in a low tone, "My God, did I do that?"

If this be true the testimony was competent. It was not for the court to say that it was untrue, and therefore reject the testimony.

Many of the witnesses did not hear the statement of Moran, but that does not affect the competency of the testimony, if there was testimony tending to establish the fact that such statement was made by him and heard by others. Both statements may not be heard or testified to by the same person. Nor does the order in which the testimony goes to the jury affect its competency, if both finally get to the jury. For this reason alone the testimony was properly received.

But even if no statements were made by Moran, the testimony under the circumstances was, we think, competent. We know that there is some conflict in the decisions of the different states on this question, and while the precise point has not been determined by the supreme court of the state, we think the tendency of the decisions is in favor of the admissibility of this testimony, leaving the weight to by determined by the jury. *Murphy* v *State*, 36 O. L., 628.

This testimony is of more or less value, depending upon the particular circumstances surrounding the accused at the time, and should undoubtedly be examined with great care and caution, as the jury were told to do in this case.

(2.) During the examination of Mrs. Blakeslee, she was asked the following question:

Question: "I will ask you if you had any conversation with him (meaning her husband) or heard any that was carried on by signs or otherwise, as to whom it was who assaulted him that night?"

To this question defendant's counsel objected.

The Court: She may answer by yes or no.

Ans. Yes, I did.

Question: What was that conversation?

To which question an objection was sustained.

The claim is that the court erred in permitting the first question to be put, or answered at all. It is said that although the question is the preliminary one, the prosecuting attorney and the court knew that the subject matter to which it related was clearly incompetent, and that the tendency was to prejudice the accused, and permit the state indirectly to get the benefit of a statement made by Blakeslee.

We think there is very little to base this claim upon. The court followed a very common practice in first ascertaining whether there was any conversation at all upon the subject to which the question related either way, and then determine its competency. There was nothing whatever disclosed from which the jury could rightfully draw the slightest inference. We cannot presume the jury make an improper and unauthorized use of the testimony, and make that the basis of error.

We are not prepared to say that the court acted at all imprudently in allowing the questions to be answered.

(3.) The court allowed the officer who made the arrest to state to the jury that before starting out to make the arrest Mrs. Blakeslee gave him a description of the man who made the assault, and to state what the description was. This evidence was received against objections of plaintiff in error.

It is shown in the record that counsel for the prisoner had cross examined this witness at great length, in an attempt to show that the witness in making the arrest acted recklessly and without any reliable information, and apparently in bad faith. The testimony objected to was called out on reexamination, to show what it was that called the attention of the witness to the facts stated by him, and as fixing the information upon which he acted. For this purpose and in explanation of the testimony called out on cross examination the testimony was competent.

It was not offered or admitted to prove any facts bearing on the identity of the prisoner. The competency of the testimony is supported to some extent by a case reported in 25 N. J. L., 566; 1 Green, sec. 101.

(4.) The state attempted, against the objection of the accused, to show that the wife of the accused visited the room of Fox on one or two occasions, but the attempt was a complete failure. This testimony was incompetent, it is true, unless brought to the knowledge of the prisoner, either by direct proof or by proof of such circumstances as to charge him with knowledge of the fact. The testimony must be both erroneous and prejudicial before a judgment will be reversed, because of its introduction to the jury. The testimony as a whole established no fact prejudicial to either the witness or accused. There was nothing in all this testimony that could by any construction have had the least weight with the jury in determining the verdict; it was no benefit to the state, nor injury to the plaintiff in error

Moran v. State of Ohio.

Many other exceptions are noted in the record to the decisions of the court on the admission and exclusion of testimony, to which we have been referred and upon which we are notified counsel rely. It is wholly unnecessary to enter upon a discussion of each of these objections. We have already noted those upon which counsel seemingly place the most reliance. We have, however, examined with care all exceptions to which our attention has been called, and find nothing in them all, of which the plaintiff in error can justly complain certainly no error for which the judgment should be reversed.

Again, it is claimed that the court erred in the instructions given to the jury upon the effect to be given to the evidence offered in the case of the previous good character of the accused, and in refusing to give to the jury two requests submitted by counsel for the prisoner upon that same subject. The two requests which the court refused to give are as follows:

Prop. III. "The defendant has put in evidence his character for being a peaceable man. This evidence it is your duty to consider the connection with the other evidence in this case by way of rebuttal of any inference that he would commit the act charged against him. The reasonable effect of the proof of the defendant's good character in this case, is to raise a presumption that the accused was not likely to have committed the crime with which he is charged. While good character is no excuse for crime it is a circumstance bearing indirectly on the question of the guilt of the accused, which it is your duty to consider in ascertaining the truth of the charge made against him in this case,"

IV. "I will say to you farther with respect to this evidence introduced by the defendant tending to show that prior to the time he perpetrated the offense for which he is on trial that should you find from the testimony in the case that he did attain a good character with respect to being a quiet, peaceable man, that of itself may be sufficient to create a doubt in your minds as to his guilt in this once."

These requests were properly refused. The court was asked to determine the weight of the testimony offered instead of a request to state to the jury the object and purposes of the testimony referred to and the proper use to be made of it.

In the first request the court was asked to say: "The reasonable effect of the proof of the defendant's good character in this cause is to raise a presumption that the accused was not likely to have committed the crime with which he is charged."

The reasonable effect of the testimony in this case was for the jury. It was not for the court to say as a matter of law that the proof offered in the case established the fact that the accused sustained a good character, nor that proof of his previous good character to the extent shown in the case raised any presumption whatever. The true rule undoubtedly is that previous good character when established is a circumstance to be considered in connection with the other evidence in the case in determining the guilt or innocence of the accused.

It is a circumstance favorable to the prisoner always to be considered, yet evidence establishing the charge may be so strong and conclusive as to render evidence of this character unavailing.

The second request was equally objectionable.

But whether these requests were objectionable or not, if the instructions given to the jury on this point were correct, and all that was required to enable the jury to fully understand and apply the law to the facts of the case, there is no ground of complaint

Upon this subject the court said to the jury:

"The defendant has called sundry witnesses to testify of his good character and as to his being a quiet and peaceable man. You have heard this testimony and the opportunity they had of knowledge on that subject. In the practical application of this evidence in the case, it will not be claimed it has anything to do with the overt act of guilt; but it is proper you should consider it when you are searching for a motive or purpose of deliberation, for it may well be supposed that a man of good character and reputable, and who has led a blameless life, would not be as likely to indulge those passions and exhibit the depravity necessary to commit murder as one habitually engaged in the violation of law; for this purpose it is proper that we should consider it.

"It is evidence offered and to be considered tending to render more probable the claim made by the defendant, that he did not commit the act. The general rule is to be kept in mind, however, that as against guilt clearly proved, good character will not avail to acquit."

The first clause of this statement standing alone might not be understood by the jury; but taken in connection with the statement following it, defining the purpose for which this testimony is offered and to be considered, it could not have misled the jury. We suppose the court intended to say that this class of evidence was of no value in establishing the *corpus delicti*. For this clause is followed immediately with the statement that this evidence may be considered in determining the motive, purpose and deliberation, essential elements of the crime charged, and was also "evidence offered and to be considered tending to render more probable the claim made by the defendant that he did not commit the crime."

This was giving to the accused, we think, the full benefit of the law upon that subject.

Other exceptions were noted in the charge, but not, we understand, seriously insisted upon. But whether that be so or not, there was no error in the charge as given or in refusing instructions asked.

Lastly, it is claimed that the verdict of the jury is contrary to the evidence.

In considering this alleged error we are to be governed by the rule of law early announced by the supreme court of the state and uniformly adhered to by that court.

The law is concisely stated in *Breese* v. *The State of Ohio*, 12 O. S., 146, where it is said:

"A judgment will not be reversed because the verdict is contrary to the evidence, unless it is manifestly so and the reviewing court will always hesitate to do so when the doubts of its propriety arise out of a conflict in oral testimony."

There is, however, a marked difference between the practicable application of the rule in civil and criminal cases.

The conditions in the two cases are entirely different. In a civil case a verdict is authorized if supported by a bare preponderance of the testimony, but in a criminal case a verdict of guilty is only authorized when the evidence produced establishes the guilt of the accused beyond a reasonable doubt; and the verdict may be manifestly against the evidence although supported by a preponderance of the testimony, for the reason that more than a preponderance of the testimony is required to warrant a verdict of guilty.

Moran v. State of Ohio.

The case turned upon the identification of the the plaintiff in error as the author of the crime.

Of those at the Blakeslee house at the time of the homicide, there were called as witnesses: Mrs. Blakeslee, Ada Davis, Arthur Blakeslee (10 years of age), W. E. Williams.

Mrs. Blakeslee had more than ordinary means of identification of the accused. For two months prior to this transaction Moran had made frequent visits to Fox, who roomed at Blakeslee's house; and she came to know him as a friend of Fox, though not by name. On this night, as her testimony appears in the record, she heard Moran's voice at the door as he inquired for Fox, but did not then know it was Moran; after the assault she saw him face to face in a light sufficient to enable her to identify him as the man she had seen on his visits to Fox. About an hour after this man was brought into her presence and identified as the one whom she had seen leave the house in the manner described by her. Mrs. Blakeslees was not testifying to the identity of a stranger whom she had seen but once, but one with whose features and appearance she was more or less familiar. She swears positively that the man she saw on that evening was Moran.

She is corroborated to some extent at least, by the witness Miss Davis and the boy Arthur. We do not believe these witnesses were guilty of corrupt perjury as is claimed by counsel for Moran.

It is said that the transactions as described by these witnesses is so unnatural and contrary to human experience that it should not have been believed by the jury; and it is suggested that Fox and Blakeslee killed each other.

This suggestion finds no support in the testimony. Both Fox and Blakeslee were wounded in a similar manner, and undoubtedly by the same instrument in the hand of the same man. There was but one hatchet found after the assault, and it could not have been used by each of these persons to mortally wound the other.

Nor is it safe to judge of the acts and conduct of one possessed of a wicked purpose to kill by the ordinary conduct of men who act from honest motives engaged in no unlawful enterprise.

Murder itself is the exception and not according to the ordinary rule of conduct in human affairs; and it is a matter of little surprise that the conduct of a murderer should not in all respects be consistent. The state of the mind that would lead one to commit murder might naturally lead to other conduct not in all respects consistent with reason.

The fact that the transaction was strange and unnatural should lead to greater care and caution in weighing the testimony and should always be considered by the jury.

In addition to the testimony of these witnesses there were a number of circumstances of some value shown in the record proper to be considered in determining the point now under consideration.

The first of these is the conduct of the accused when charged with being the author of the crime on the night of the homicide at the Blakeslee house—the circumstances of which have been stated.

If he did say, as one witness says he did, "My God, did I do that?" it was quite important. If, however, as assumed by the counsel for the accused, nothing was said, it was of some value. If Moran was innocent of the charge made against him, it would seem but natural that he should have said something. We do not accept the excuse for not doing so that there was no time given him for a reply.

Again, Moran, at and before this transaction, was in the employment of the American Tool company. The hatchet left at the Blakeslee house after the assault was a peculiar one. The head was octagon, two sides of which were bronzed; the edge was nicked, the head loose and somewhat battered. Prior to the assault a hatchet of precisely this description was at the factory where Moran was employed. There was some testimony tending to establish the fact that Moran took a hatchet home with him shortly before this night. This hatchet was not seen after the assault, at the factory. This testimony, we think in connection with the other testimony in the case, was of some value and should not be overlooked.

Again, the blood spots upon the clothes of Moran should not be overlooked. There were small spots of blood upon both sleeves of the coat, slight traces of blood on the vest, also near left arm hole. On left sleeve of shirt, on the cuff, two blood stains, one one-half inch long; a slight trace on the neck tie, and a large smear of blood on the left side pocket of the pantaloons.

Some of the statements of the accused were well calculated to challenge the closest scrutiny. I will not stop to enumerate them in detail, but his account of what transpired while he was at the Blakeslee house, and his ignorance of the place and the purpose for which he was brought there, were somewhat unnatural.

A review of this entire record fails to convince us that the verdict of the jury was manifestly contrary to the evidence. We are satisfied that the accused had a fair and impartial trial, and we see no reason for setting aside the judgment and sentence.

For the plaintiff, *Foran & Dowley.*

For the state, *Neff & Strimple.*